**GENERAL ACCOUNTING OFFICE, Petitioner,**

v.

**GENERAL ACCOUNTING OFFICE PERSONNEL APPEALS BOARD, Respondent,**

**Morris L. Shaller, Intervenor.**

**No. 81–2401.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 26, 1982.

Decided Jan. 18, 1983.

Robert H. Levan, Columbia, Md., for respondent.

Morris L. Shaller, was on the brief, for intervenor, pro se.

Howard S. Scher, Atty., Dept. of Justice, Washington, D.C., with whom Stanley S. Harris, U.S. Atty., and William Kanter, Atty., Dept. of Justice, Washington, D.C., were on the brief, for petitioner.

Before WRIGHT and EDWARDS, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

### TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | FACTUAL BACKGROUND | 518 |
| | A. The Proceedings Before the PAB | 518 |
| | B. The PAB's Disposition of the Case | 520 |
| II. | DISCUSSION | 521 |
| | A. The Statutory Scheme | 521 |
| | B. Reviewability | 523 |
| | C. The General Counsel's Role In PAB Proceedings | 526 |
| | 1. The Estoppel Issue | 526 |
| | 2. The Statutory Authority Permitting the General Counsel to Prosecute Appeals in Adverse Action Cases | 528 |
| | a. Plain Language of the Statute | 528 |
| | b. Legislative History of the Statute | 530 |
| | c. Authority of the PAB Versus that of the Comptroller General | 531 |
| | d. "Comparable" Models | 532 |
| | e. Summary | 533 |
| | D. Issues Pertaining to Jurisdictional Questions and the Merits | 534 |
| III. | CONCLUSION | 536 |

HARRY T. EDWARDS, Circuit Judge:

The General Accounting Office ("GAO") is a legislative support agency responsible for auditing, investigating, reporting on and proposing improvements to the programs and financial activities of executive agencies in the federal government. In 1980, Congress passed the General Accounting Office Personnel Act of 1980 ("GOA-PA"),[1] establishing a personnel system for the GAO. This system exists independent of executive branch personnel operations and authorities so as to avoid any conflict of roles between officials in the GAO and officials in the federal agencies subject to GAO oversight. Central to this independent personnel system is the GAO Personnel Appeals Board ("PAB" or "Board"),[2] which, along with a PAB General Counsel ("General Counsel"),[3] carries out functions comparable to those of the Merit Systems Protection Board ("MSPB"), the Office of Special Counsel ("Special Counsel"), the Equal Employment Opportunity Commission ("EEOC"), and the Federal Labor Relations Authority ("FLRA").

The GAO, here as an employer agency, seeks review of a PAB order awarding retroactive reinstatement and backpay to Morris L. Shaller, a grade GS–7 Management Analyst.[4] The GAO contends, first, that the Board had no jurisdiction over the case because Shaller was a probationary employee at the time of his termination. Second, the GAO asserts that, even if the PAB had

jurisdiction, the General Counsel, who represented Shaller pursuant to regulations implementing the GAOPA, should have been disqualified from the proceedings. The Board prefaces its response to these arguments with threshold contentions that the appeal must be dismissed as nonreviewable and, alternatively, that the GAO should be estopped from raising the disqualification issue. Otherwise, the Board rejects the GAO's arguments as meritless, contending that its decision is supported by substantial evidence and is not inconsistent with law and, therefore, should be affirmed.[5]

For the reasons set forth below, we reject the PAB's nonreviewability and estoppel contentions, affirm the PAB's ruling on the disqualification issue, and defer decision on the merits (including the question of the PAB's jurisdiction) pending further consideration by the PAB on remand of the record.

## I. Factual Background

### A. The Proceedings Before the PAB

Morris Shaller began federal employment on March 10, 1980, the date of his career-conditional appointment as a GS–5 grade Procurement Agent with the Defense Logistics Agency ("DLA").[6] Starting from the date of this initial career-conditional appointment, Shaller began a year-long probationary period.[7] Prior to completion of

---

1. Pub.L. No. 96–191, 94 Stat. 27 (1980) (codified at 31 U.S.C. §§ 52–1 to –7 (Supp. V 1981), *amended by* Act of Sept. 13, 1982, Pub.L. No. 97–258, 96 Stat. 877, 896–902. The recent amending statute made revisions throughout title 31 of the United States Code, substituting "simple language . . . for awkward and obsolete terms . . . ." H.R.Rep. No. 651, 97th Cong., 2d Sess. 1 (1982) [hereinafter cited as H.R.Rep. No. 651], U.S.Code Cong. & Admin.News, p. 1895. Congress intended "no substantive change in the law." *Id.* at 3, U.S.Code Cong. & Admin.News, pp. 1896–97.

2. *See* 31 U.S.C. § 52–3 (Supp. V 1981) (amended 1982).

3. *See* 31 U.S.C. § 52–3(f)–(g) (Supp. V 1981) (amended 1982).

4. *See Shaller v. General Accounting Office,* PAB Dock. No. 02–102–04–81, slip op. (Aug. 11, 1981), *reprinted in* Joint Appendix ("J.A.") 61 [hereinafter cited as *Initial Decision*]; *Shaller v. General Accounting Office,* PAB Dock. No. M1–B1, slip op. (undated), *reprinted in* J.A. 99 [hereinafter cited as *Decision on Reconsideration*].

5. Shaller, who intervened as a respondent in the proceedings before this court, argues for affirmance on substantially the same grounds urged by the PAB.

6. *Initial Decision,* J.A. 62.

7. *See* 5 C.F.R. § 315.801(a)(1) (1982).

that trial period, the GAO gave Shaller a career-conditional appointment, effective May 4, 1980, without break in service, as a GS–7 grade Management Analyst.[8] The precise nature of the personnel action effecting Shaller's GAO appointment is seriously disputed. The Standard Form 52 ("SF 52"), requesting the personnel action, indicates *both* that Shaller was selected from a certificate of eligibles and that he was transferred.[9] Whatever the nature of the personnel action effecting Shaller's appointment, however, the SF 52 clearly indicates that he was "subject to completion of [a] 1 year probationary (or trial) period commencing 05–04–80." [10]

On March 10, 1981, the GAO notified Shaller that he would be terminated effective March 21, 1981.[11] It is undisputed that this notice failed to grant Shaller procedural protections accorded non-probationary terminatees.[12] Shaller wrote to the PAB on March 12, contending that, because he had already completed a year of service with the federal government, his termination failed to comply with proper procedures.[13] The General Counsel notified Shaller on March 19 that the complaint letter would be treated as a petition for review, despite having been filed prematurely.[14] On March 25, the GAO responded to the petition and indicated that Shaller's appointment was by selection from a certificate of eligibles.

The GAO thus concluded that, because such selectees are required to complete a new trial period commencing from the date of appointment, Shaller was not entitled to the procedural rights of a non-probationary employee.[15]

Upon receipt of the GAO's response, the General Counsel commenced an investigation of the case. After completion of his investigation, the General Counsel issued a report finding that Shaller was a non-probationary employee on the date of his discharge; the General Counsel accordingly opined that Shaller should be reinstated with backpay.[16] Thereafter, the General Counsel drafted and filed a petition with the PAB formally alleging improper termination and seeking reinstatement and backpay for Shaller. On May 29, 1981, the PAB, in turn, notified Shaller and the GAO of the completion of the investigation and the filing of the petition.[17] Appended to this notice was a copy of the petition, which indicated that the General Counsel would represent Shaller in all subsequent proceedings.[18]

On receipt of the PAB's notice, the GAO filed a response requesting a hearing, but making no objection to the General Counsel's representation of Shaller or otherwise indicating that the General Counsel's role in the proceedings would be at issue.[19] The

8. *Initial Decision,* J.A. 62.

9. Standard Form 52, "Request for Personnel Action," *reprinted in* J.A. 14.

10. *Id.* at 15.

11. Letter from Felix R. Brandon, II, Director of Personnel for the GAO, to Morris Shaller, dated March 10, 1981, *reprinted in* J.A. 1.

12. *See* 4 C.F.R. § 7.6(b) (1982).

13. Letter from Morris Shaller to the PAB, dated March 12, 1981, *reprinted in* J.A. 3.

14. Letter from Carl D. Moore, General Counsel, to Morris L. Shaller, dated March 19, 1981, *reprinted in* J.A. 8. The General Counsel enclosed a copy of the PAB's rules and advised Shaller that "[s]hould you require any procedural assistance in this matter, please do not hesitate to contact this office . . . ." *Id.*

15. Letter from Felix R. Brandon, II, Director of Personnel for the GAO, to Carl Moore, General Counsel, dated March 25, 1981, *reprinted in* J.A. 10.

16. *Shaller v. General Accounting Office,* PAB Dock. No. 02–102–04–81 (undated filing) (Report of the General Counsel) (undated), *reprinted in* J.A. 19.

17. Notice of Petition for Review, dated May 29, 1982, *reprinted in* J.A. 16.

18. *Shaller v. General Accounting Office,* PAB Dock. No. 02–102–04–81, Petition for Review (undated), *reprinted in* J.A. 17, 18 ¶ 6.

19. Letter from J. Dean Mosher, Senior Attorney, Office of the GAO's General Counsel, and Stephen M. Schmal, Chief, LMER Branch, to Edward C. Gallas, PAB Chairman, *reprinted in* J.A. 11.

PAB set a hearing for July 28, 1981.[20] On July 24, 1981, four days before the scheduled hearing, the GAO filed motions to disqualify the PAB's General Counsel and to stay the proceedings pending resolution of "the legal issue of the right of the General Counsel ... to act in a prosecuting role, or as a representative of a General Accounting Office employee, in hearings by the Board ...." [21] The PAB rejected these motions summarily.[22] At the July 29 hearing, the PAB accorded the GAO an opportunity to renew its motion for a stay; [23] but after hearing argument on the motion, the PAB again denied the GAO's request.[24] The GAO's representatives thereupon refused to participate further in the proceedings and left the hearing.[25]

### B. *The PAB's Disposition of the Case*

The PAB's initial decision, issued on August 11, 1981, failed to consider the disqualification issue, concluded that Shaller was non-probationary on the date of his discharge, invalidated the termination, and awarded reinstatement with backpay.[26] On the motion to stay, the PAB explained that "[t]his issue was not raised in a timely manner," and "[t]o defer a decision regarding [Shaller's] appeal would ... prejudice [his] ... right to timely resolution of [the] ... appeal;" in addition, the Board pointed out, "other alternatives are available to [the GAO] ... should it wish to further pursue [the] ... issue of representation before the Board." [27] On the merits, the PAB concluded that the "transfer" designation on the SF 52 governed the nature of the personnel action; since employees appointed non-com-

petitively by transfer need not serve a new probationary period, the Board held that Shaller had only to complete the trial period he began at the DLA, which ended March 9, 1981.[28]

On September 9, 1981, the GAO moved for reconsideration of the decision.[29] The GAO advanced several new arguments on the issue of Shaller's employment status and narrowed its grounds for challenging the General Counsel's authority to represent Shaller. The GAO for the first time argued that Shaller's transfer to a GS–7 grade position violated certain competitive appointment principles. And while the GAO had originally argued that the General Counsel was ineligible to appear in *any* case before the Board, it now argued only that the General Counsel was ineligible to appear representing individual employees in adverse action appeals.

The PAB denied the motion for reconsideration in an undated decision issued in late Fall 1981.[30] The Board restated the rationale for its earlier decision, but elaborated on it in several respects. As to the disqualification issue, the PAB, though still insisting that the motion was untimely, addressed the GAO's arguments:

> The clear impact of the [legislative history of the GAOPA] ... is that the Board (and implicitly its General Counsel) must be a multi-functioning entity, with the responsibilities of the MSPB, FLRA, Special Counsel and EEOC being lodged in a single body. Consequently, the Board *and* its General Counsel must perform many roles. For example, the prosecutorial *and* investigative functions of

**20.** Notice of Hearing (June 26, 1981), *reprinted in* J.A. 35.

**21.** *Shaller v. General Accounting Office,* PAB Dock. No. 02–102–04–81 (filed July 24, 1981) (Motion to Disqualify Personnel Appeals Board General Counsel and Motion to Stay), *reprinted in* J.A. 36.

**22.** Brief for GAO 10.

**23.** Brief for PAB 4.

**24.** *Id.*

**25.** *Id.*

**26.** *Initial Decision,* J.A. 63 n. 1, 64.

**27.** *Id.* at 63 n. 1.

**28.** *Id.* at 63–64.

**29.** *Shaller v. General Accounting Office,* PAB Dock. No. 01–102–04–81 (filed Sept. 9, 1981) (Motion to Reopen and Reconsider), *reprinted in* J.A. 66.

**30.** *Decision on Reconsideration,* J.A. 99; *see* Brief for GAO 11.

the General Counsel of the FLRA must perforce be placed in the hands of the Board's General Counsel in addition to his responsibilities as Special Counsel for [the GAO's] . . . employees.

Similarly, [the GAOPA] . . . provided in Section 4(m) that the implementing regulations of the Board provide employees of [the GAO] . . . with "the same rights and protections as employees in the executive branch." The Board was delegated broad discretion by Congress for this purpose. . . .

[T]he ultimate responsibility [for the adoption of implementing regulations] clearly rested with the Board[.] . . . A contrary interpretation would have ignored the Congressional mandate that the Board be independent of [the GAO] . . . in evaluating and deciding cases brought before it. After due deliberation and consistent with the intent of Congress, the Board adopted its present regulatory framework. That scheme delegates broad authority to the principal full-time employee of the Board—its General Counsel.

The arguments espoused by [the GAO] . . . in its memorandum in support of its motion do not persuade the Board that its present regulatory framework for processing appeals to the Board, particularly the broad delegations of authority to the General Counsel, exceeds the Board's statutory authority. In fact, the rights and protections accorded [the GAO's] . . . employees by the new law, when set within the context of the unique and singular body created by Congress as the ultimate administrative forum for those rights and protections, militates against a lesser role for the Board's General Counsel.[31]

On the merits, the PAB clarified the basis for its conclusion that Shaller had been transferred non-competitively. Shaller's appointment "was a two-step process," the Board pointed out.[32] The first step, selection from a certificate of eligibles, was a competitive procedure, and the second step, transfer without break in service, was a non-competitive procedure. Thus, the Board explained, Shaller's appointment was "by transfer *after* selection from a certificate of eligibles."[33] Although the PAB acknowledged that a straight transfer without appointment from a certificate of eligibles would have violated the competitive appointment principles cited by the GAO, the Board held that Shaller's "appointment by transfer from the Defense Logistics Agency to [the GAO] . . . was legal since [Shaller] . . . was first selected from a certificate of eligibles."[34] Shaller having been validly appointed by noncompetitive transfer, the Board reiterated that he only had to complete a trial period which ended March 9, 1981.

## II. DISCUSSION

This case raises several questions of first impression concerning interpretations of the recently enacted GAOPA and regulations promulgated pursuant thereto. We will therefore begin with a brief exploration of the statutory scheme and its legislative history. Aided by that background, we will then turn, first, to reviewability, second, to the motion to disqualify and, finally, to the PAB's jurisdiction over the case.

### A. *The Statutory Scheme*

Prior to enactment of the GAOPA, the GAO was something of an anomoly among federal administrative agencies. It was an arm of Congress, "independent of the executive departments and under the control and direction of the Comptroller of the United States."[35] Yet, for purposes of most federal laws dealing with agency organization and employees, title 5 of the

---

31. *Id.* at 102–03.

32. *Id.* at 108.

33. *Id.* (emphasis added).

34. *Id.* at 109.

35. 31 U.S.C. § 41 (1976); *see Lawrence v. Staats,* 640 F.2d 427, 429 & n. 3 (D.C.Cir.1981); *id.* at 440 & n. 38 (Robinson, C.J., dissenting).

United States Code defined the GAO as an "Executive agency." [36] All employees of the GAO, moreover, were appointed "in accordance with the civil service laws and regulations," [37] and thus were ultimately accountable to the executive. [38]

This dual status created an inevitable conflict of roles. On the one hand, the GAO had oversight authority over officials in the executive branch personnel management system, while, on the other, the GAO staff was subject to the control of the officials in that system. [39] During the 1970s, tremendous growth in federal personnel expenditures, coupled with increased congressional attention to merit system abuses, intensified the problem as Congress stepped up the GAO's monitoring role over executive personnel matters. [40] Finally, following passage of the Civil Service Reform Act of 1978, [41] which established a complex network of federal personnel agencies [42] and delegated to the GAO correspondingly burdensome auditing duties, [43] Congress sought to cure the conflict of roles problem by enacting the GAOPA. Under the new law, the Comptroller General was given the power to "appoint, fix the pay of, and remove employees of the General Accounting Office." [44]

**36.** 5 U.S.C. §§ 104–105 (1976).

**37.** 31 U.S.C. § 52(b) (1976), *amended by* the GAOPA, Pub.L. No. 96–191, 94 Stat. 27, 33 (1980). The Comptroller General and his Deputy were the only exceptions to civil service coverage. *See* 31 U.S.C. § 42 (1976) (amended 1980); *Lawrence v. Staats,* 640 F.2d at 443 (Robinson, C.J., dissenting).

**38.** *See* 5 U.S.C. § 3301 (1976).

**39.** In a House hearing on an early proposal to set up an independent personnel system, Elmer Staats, then Comptroller General, testified that:

[T]he existing interrelationship between the GAO and the [Civil Service] Commission presents a continuous conflict of roles. On the one hand, the GAO audits the effectiveness, propriety, and legality of Commission policies and enforcement of Commission regulations. Reports on these audits are usually made public.

On the other hand, the Commission controls the system upon which the GAO must rely for acquiring and managing its staff. Within this relationship exists a very real danger that GAO audits may appear to be compromised.

. . . .

This situation breeds suspicion that GAO reports to the Congress may be influenced in some ways by fears on the part of GAO staff that criticism of the Commission's operations will result in actions taken consciously or unconsciously, which would impact adversely on the GAO as an organization or on the appointment, compensation, or advancement of any of its employees.

*Separate Personnel System for the General Accounting Office: Hearing on H.R. 12845 Before the House Subcomm. on Civil Service of the Comm. on Post Office and Civil Service,* 95th Cong., 2d Sess. 3–4 (1978) [hereinafter cited as *Hearing on H.R. 12845*].

**40.** H.R.Rep. No. 494, 96th Cong., 1st Sess. 2 (1979) [hereinafter cited as *House Report*]; S. Rep. No. 540, 96th Cong., 1st Sess. 2 (1979) [hereinafter cited as *Senate Report*].

**41.** Pub.L. No. 95–454, 92 Stat. 1113–1226 (1978) (codified as amended at 5 U.S.C. §§ 1101–8913 (Supp. V 1981)) [hereinafter cited as Reform Act].

**42.** The MSPB assumed the adjudication responsibilities formerly performed by the Civil Service Commission ("Commission"), and the MSPB's enforcement arm, the Special Counsel, took on a newly created role as prosecutor of merit system abuses. *See* Reorg. Plan No. 2 of 1978, §§ 201–204, 3 C.F.R. 325–327 (1979), *reprinted in* 5 U.S.C. § 1101 note at 149–50 (Supp. V 1981). The Office of Personnel Management ("OPM") assumed the Commission's duty to administer the federal personnel system, monitoring the classification system, rates of pay, performance appraisal, etc. *See* Reorg. Plan No. 2 of 1978, §§ 101–105, 3 C.F.R. 323–325 (1979), *reprinted in* 5 U.S.C. § 1101 note at 148–49 (Supp. V 1981). The FLRA assumed the role of administrator of the federal labor management relations program as successor to the old Federal Labor Relations Council. *See* Reorg. Plan No. 2, §§ 301–307, 3 C.F.R. 327–328 (1979), *reprinted in* 5 U.S.C. § 1101 note at 150 (Supp. V 1981). And the EEOC continued its oversight and enforcement responsibilities under federal non-discrimination laws. *See* 42 U.S.C. §§ 2000e–4 to –13 (1976 & Supp. IV 1980).

Thus, there are now five executive agencies—the MSPB, the Special Counsel, the OPM, the FLRA, and the EEOC—responsible for various different areas of personnel management.

**43.** *See* 5 U.S.C. § 2304 (Supp. V 1981).

**44.** 31 U.S.C. § 52(a) (Supp. V 1981).

Two primary themes appear in the legislative history of the GAOPA. First, the personnel system established for the GAO was to be truly independent of the executive branch. To remove the appearance of conflict between the GAO and the executive personnel agencies, Congress opted for a self-contained, autonomous system exclusively for GAO employees. The GAO was to be granted "greater flexibility in hiring and managing its workforce without regard to civil service laws ...," S.REP. No. 450, 96th Cong., 1st Sess. 3 (1979) [hereinafter cited as *Senate Report*], and, toward that end, the Comptroller General was to have "wide discretion ... in designing [an independent] ... personnel management system," H.R.REP. No. 494, 96th Cong., 1st Sess. 4 (1979) [hereinafter cited as *House Report*].

Second, Congress desired for employees of the GAO the same degree of legal protection accorded executive branch employees. Just prior to enactment of the GAO-PA, the executive personnel management system was overhauled by the Reform Act, which granted executive employees a host of new procedural and substantive rights. So that GAO employees could enjoy protections similar to those afforded other federal employees under the 1978 reform legislation, Congress rejected proposals which would have granted the GAO unfettered discretion to design a personnel system; [45] instead, the lawmakers adopted a statute setting forth a comprehensive scheme generally modeled on the Reform Act.

Congress' chosen scheme, while explicitly incorporating many substantive rights from the Reform Act, does not replicate the Reform Act's complex structure. At the core of the GAO personnel system is a single agency—the PAB—which carries out the combined responsibilities of the MSPB, the Special Counsel, the FLRA, and the EEOC. The *House Report* describes the role of the PAB as follows:

> The cornerstone of [the proposed legislation] ... is the creation of a GAO Personnel Appeals Board to handle appeals from such matters as adverse actions, prohibited personnel practices, union elections, determinations of bargaining units, unfair labor practices and discrimination appeals. In handling each of these types of cases, the GAO Personnel Appeals Board acts in the place of the Merit Systems Protection Board, the Federal Labor Relations Authority, or the Equal Employment Opportunity Commission, as applicable. The committee expects that the Board will refer to decisions of these agencies for guidance. The general counsel to the Personnel Appeals Board acts in the place of the Special Counsel to the Merit Systems Protection Board. In this way, the employees of the GAO retain all the rights enjoyed by employees in the executive branch, while, at the same time, the conflict of roles is eliminated.

*Id.* at 5–6. Thus, Congress sought to solve the GAO's conflict of roles problem by granting the GAO broad authority to manage its own workforce. But, at the same time, Congress also sought to guarantee employee rights by establishing an independent, internal board available to enforce and adjudicate those rights.

## B. *Reviewability*

On the merits of this appeal, we first confront a challenge to the right of the GAO to seek judicial review of a PAB decision.[46] There is, of course, a presumption in

---

**45.** *See* H.R. 12845, 95th Cong., 2d Sess. (1978); *Hearing on H.R. 12845* at 17; *see also* S. 3339, 96th Cong., 1st Sess. (1979); *General Accounting Office Personnel System: Hearings on S. 3339 Before the House Subcomm. on the Civil Service of the Comm. on Post Office and Civil Service,* 96th Cong., 1st Sess. 44 (1979) [hereinafter cited as *Hearings on S. 3339*].

**46.** The PAB fails to distinguish reviewability and standing. *See* PAB Points and Authorities in Support of Motion to Dismiss 2 (asserting

that Congress did not intend to authorize review); *id.* at 6 (asserting that the GAO lacks standing). Standing and reviewability, however, are distinct inquiries. *See Barlow v. Collins,* 397 U.S. 159, 169–75, 90 S.Ct. 832, 839–842, 25 L.Ed.2d 192 (1969) (Brennan, J., concurring in result and dissenting). Generalizations on subtle justiciability questions are hazardous, but basically the question of reviewability focuses on "whether Congress meant to deny or to allow judicial review of the agency action at

favor of reviewability which the PAB may rebut only by showing "persuasive reason to believe that ... the purpose of Congress" was to preclude review. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). To resolve whether this presumption has been rebutted here, we look first to the plain language of the statute.

Section 4(*1*) of the GAOPA [47] provides:

A person may apply for review of a final decision [of the Board] ... by filing a petition for review with the United States Court of Appeals for the District of Columbia Circuit or with the court of appeals of the United States for the circuit in which the person resides. Chapter 158 of title 28 applies to a review under this subchapter, except the petition for review shall be filed by the 30th day after the petitioner receives notice of the decision. The court shall set aside a final decision the court decides is—

(1) arbitrary, capricious, an abuse of discretion, or otherwise not consistent with law;

(2) not made consistent with required procedures; or

(3) unsupported by substantial evidence.

Nothing on the face of this statute precludes the GAO from seeking review.[48] Nor does any established rule of construction require the conclusion that the GAO is not a "person" entitled to seek judicial review. Statutes using the word "person" are generally construed to exclude non-natural persons such as sovereign states and their subdivisions. *See United States v. Cooper Corp.,* 312 U.S. 600, 604, 61 S.Ct. 742, 743, 85 L.Ed. 1071 (1941). "But there is no hard and fast rule of exclusion," *id.* at 604–05, 61 S.Ct. at 743, 744, and "[t]he purpose, the subject matter, the context, the legislative history, and the executive interpretation" ultimately determine whether an artificial person is to be excluded, *id.* at 605, 61 S.Ct. at 744; *see Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 92, 55 S.Ct. 50, 53, 79 L.Ed. 211 (1934) ("While it cannot be said that the United States, in its corporate capacity as an artificial person, has a bodily presence in any place, it is not unreasonable to hold that in the eye of the law, it has a residence, and especially so when a contrary holding would defeat the evident purpose of a statute."); *cf. First National Bank of Boston v. Bellotti,* 435 U.S. 765, 779 n. 14, 98 S.Ct. 1407, 1417 n. 14, 55 L.Ed.2d 707 (1978) ("Whether

---

the instance of the plaintiff," *id.* at 169, 90 S.Ct. at 839, while "the 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions,'" *id.* at 170–71, 90 S.Ct. at 839–40 (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)).

Since the GAO was a party to the proceedings below, and suffered an adverse decision requiring reinstatement and backpay to a former employee, it clearly has the requisite stake in the controversy to confer standing.

**47.** Pub.L. No. 97–258, § 755, 96 Stat. 902 (codified with some differences at 31 U.S.C. § 52–3(*1*) (Supp. V 1981)).

**48.** Recent amendments to title 31 of the United States Code, *see supra* note 1, substantially revised section 4(*1*) of the GAOPA. The revising statute makes two changes relevant to our consideration of section 4(*1*)'s language. First, the statute deletes reference to judicial review

of "agency action, findings, or conclusions ...." The PAB argues that the term "agency" in this phrase meant the GAO, and thus that Congress contemplated judicial review only at the instance of employees. Prior to clarification, the word "agency" was indeed highly ambiguous. But since most courts have construed the term "agency" to refer to the adjudicatory agency rather than the employing agency under an identically phrased scope of review provision in the Reform Act, *see Devine v. White,* 697 F.2d 421 at 439 n. 102 (D.C.Cir.1983), we think the revising statute simply clarified Congress' original intent that "agency" meant the PAB, not the GAO. *See Russell v. LEAA,* 637 F.2d 1255, 1258 n. 5 (1980) (a legislative revision intending no substantive change may sometimes "clarif[y] the original legislative intent").

Second, the revising statute substitutes the term "person" for "petitioner." As will be explained below, we think the legislative history of the GAOPA shows an intent to include the GAO within the class of persons entitled to seek review.

or not a particular [constitutional] guarantee is 'purely personal' or is unavailable to corporations for some other reason depends on the nature, history, and purpose of the particular constitutional provision.").

The PAB argues that the legislative history clearly reveals a congressional intent to preclude the GAO from seeking judicial review. Consideration of the sparse history bearing on this question leads us to disagree. We do not read the *House Report* to "analyze[] the language [of section 4(*l*)] only in terms of ... employees ... exercising the right of judicial review ...." PAB Points and Authorities in Support of Motion to Dismiss 3. The section-by-section analysis cited by the Board summarizes the language of section 4(*l*) in terms wholly neutral as between the GAO and GAO employees.[49] Indeed, Congress' rejection of proposed language that would have made judicial review unavailable to the GAO strongly suggests that no such distinction was intended. Under a judicial review provision offered for inclusion in an early proposal to establish an independent personnel system, PAB decisions would have been "final and binding" on the GAO;[50] a later proposal, ultimately enacted as the GAOPA, instead permitted review of "any final decision" of the PAB.[51] In light of this record, we must conclude that the legislative history, if anything, shows that the GAO is a "person" entitled to seek review.[52]

The Board argues, however, that since Congress specifically granted the Director of the OPM authority under the Reform Act to seek judicial review of MSBP decisions,[53] omission of similarly specific authority under the GAOPA means that Congress sought to bar the GAO from obtaining judicial review of PAB decisions. This approach to analyzing legislative intent carries little weight. The theory that Congress knew how to provide specific authority for judicial review and, therefore, the omission of that authority demonstrates that it wished to deny a right of judicial review, is "'unreliable * * * for it stands on the faulty premise that all possible alternative or supplemental provisions were necessarily considered and rejected by the legislative draftsmen.'" *United Steelworkers v. Marshall,* 647 F.2d 1189, 1232 (D.C.Cir. 1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981) (quoting *National Petroleum Refiners Association v. FTC,* 482 F.2d 672, 676 (D.C.Cir.1973), *cert. de-*

---

**49.** That analysis states, in full:

Paragraph (1) of section 4(*l*) provides that final decisions of the Board (or of any panel or individual member designated under subsection (j)) under subsection (h)(1) (relating to adverse actions), (h)(2) (relating to prohibited personnel practices), (h)(5) (relating to unfair labor practices), or (h)(6) (relating to discrimination) may be appealed to the United States court of appeals for the appropriate circuit. Any appeal under subsection (*l*) shall be in accordance with the procedures of chapter 158 of title 28, United States Code, relating to orders by Federal agencies. The last sentence of paragraph (1) requires any petition for review to be filed within 30 days after the date the petitioner receives notice of the final decision of the Board.

Paragraph (2) sets forth the standard of review and provides that the court shall review the record and set aside any agency action, findings, or conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) obtained without procedures required by law, rule, or regulation having been followed; or (C) unsupported by substantial evidence.

*House Report* 14.

**50.** *Hearings on S. 3339* at 16.

**51.** 31 U.S.C. § 52–3(*l*) (Supp. V 1981) (amended 1982); *see* H.R. 5176, 96th Cong., 1st Sess. (1979); *see also* S. 1879, 96th Cong., 1st Sess. (1979); *GAO Legislation: Hearings on S. 1878 and S. 1879 Before the Senate Subcomm. on Energy, Nuclear Proliferation, and Federal Services of the Comm. on Governmental Affairs,* 96th Cong., 1st Sess. 130 (1979). The phrase "any final decision" was changed to "a final decision" in the recent revising statute.

**52.** We recognize that rejection of proposed legislation during the course of enactment provides a hazardous basis from which to determine legislative intent, but the rejection of a specific provision, as here, can be particularly significant. *See Fox v. Standard Oil Co.,* 294 U.S. 87, 96, 55 S.Ct. 333, 337, 79 L.Ed. 780 (1935); *People for Environmental Progress v. Leisz,* 373 F.Supp. 589, 592 (C.D.Cal.1974).

**53.** 5 U.S.C. § 7703(d) (Supp. V 1981).

*nied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974)).

In any event, if anything, we think it much fairer to assume that, since the OPM may challenge decisions having a substantial impact on civil service laws, rules, regulations and policy directives, "[c]ertainly, Congress had no intent . . . to make [the] GAO . . . powerless in the face of adverse decisions having a substantial impact on its personnel system." GAO Opposition to Motion to Dismiss 4. We view Congress' failure to provide precise statutory authority as consistent with its pattern in the GAOPA of following the Reform Act as a model without *literally* incorporating all of the particular terms of that Act. Moreover, in many places the Reform Act details at length the authority and responsibility of each respective executive personnel agency, while the GAOPA, in analogous places, contains no similar detail.[54]

We conclude then—given the literal language and the legislative history of the GAOPA—that the GAO may obtain review of PAB decisions. We do not reach this result solely on a comparison with the OPM's statutory right of review under the Reform Act. Rather, we emphasize that the GAOPA, unlike the Reform Act, does not in any way expressly limit the agency's right of judicial review.[55] Thus, consistent with the overall purposes of the GAOPA, we hold that the GAO is a "person" within the meaning of section 4(*l*).[56]

**C. *The General Counsel's Role in PAB Proceedings***

**1. *The Estoppel Issue***

The PAB argues that the GAO should be estopped from challenging the General Counsel's authority to represent Shaller. Estoppel applies, the PAB contends, primarily because the GAO failed to raise the issue of disqualification until just prior to the hearing. In addition, the Board argues that the GAO could have raised the disqualification issue in an alternative manner and that it has failed to show any prejudice from the General Counsel's representation of Shaller. In light of these factors, the PAB urges that this matter is governed by case law holding the government estopped where its own wrongful conduct threatens a serious injustice and the public interest would not be unduly damaged by invocation of estoppel.

We find these arguments to be meritless. We need not canvass at length the law of estoppel against the government, for the doctrine has no conceivable application in this case. Estoppel generally requires that government agents engage—by commission or omission—in conduct that can be characterized as misrepresentation or concealment, or, at least, behave in ways that have or will cause an egregiously unfair result.[57] The GAO has engaged in no such misconduct here.

---

**54.** *Compare* 5 U.S.C. § 1205 (Supp. V 1981) (detailing the powers and functions of the MSPB) *with* 31 U.S.C. § 52–3(h), (j), (k), (m) (Supp. V 1981) (amended 1982) (detailing the powers and functions of the PAB).

**55.** *See* 5 U.S.C. § 7703(a)(1) (Supp. V 1981) (provision in Reform Act providing that "[a]ny employee or applicant for employment adversely affected or aggrieved by a final order or decision of the [MSPB] . . . may obtain judicial review of the order or decision"). *See also* 5 U.S.C. § 7703(d) (Supp. V 1981) (provision in Reform Act allowing the OPM to petition for review *only* on a showing of, *inter alia,* substantial impact on a civil service law, rule, regulation or policy directive).

**56.** Any petition for judicial review is of course subject to the provisions of section 4(*l*) of the GAOPA.

**57.** It is clear that "[t]he fundamental principle of equitable estoppel applies to government agencies, as well as private parties," *Investors Research Corp. v. SEC,* 628 F.2d 168, 174 n. 34 (D.C.Cir.), *cert. denied,* 449 U.S. 982, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980), but traditionally there has been a reluctance to apply the doctrine against the government, *see, e.g., Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 383–84, 68 S.Ct. 1, 2–3, 92 L.Ed. 10 (1947); *Utah Power & Light Co. v. United States,* 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917). Courts following the traditional line have suggested that only "affirmative misconduct" by government officials will trigger an estoppel, *see Oki v. INS,* 598 F.2d 1160, 1162 (9th Cir.1979) (per curiam); *Leimbach v. Califano,* 596 F.2d 300, 305 (8th Cir.1979). The Supreme Court has yet to make clear whether anything less than "affirmative misconduct" will justify estoppel. *See Schweiker v. Hansen,* 450 U.S. 785, 788–89,

The PAB relies heavily on an apparent inconsistency in the GAO's litigation position; the GAO at first appeared to acquiesce in the General Counsel's representation of Shaller, but then changed its position—just prior to the hearing—and moved to disqualify. Having failed to so move or otherwise object earlier, the Board argues, the GAO was guilty of conduct bordering on laches. Not only are we unable to find fault in the timing of the GAO's motion, we consider the Board's arguments on this point to be wholly specious.

First of all, there is a ready explanation for the timing of the GAO's objection. The General Counsel represented Shaller pursuant to a Board regulation codified at 4 C.F.R. § 28.17(d) (1982); this regulation requires the General Counsel to prosecute an appeal in an adverse action case where the claim appears meritorious, unless the petitioner declines representation by the General Counsel.[58] Throughout much of the time when the administrative appeal of this case was pending, 4 C.F.R. § 28.17(d)—although in effect during the pendency of rulemaking proceedings—was merely a proposal before the Board.[59] The GAO objected to the proposed regulation on May 1, 1981 as part of its general comments on the Board's proposed rules.[60] Once the PAB issued its final rules, however, the GAO soon thereafter brought the motion to disqualify. From May until July of 1981, 4 C.F.R. § 28.17(d) had not yet been permanently adopted; thus there was still a chance, however remote, that the PAB might adopt the objections filed by the GAO, and voluntarily

withdraw the General Counsel's authorization to appear on Shaller's behalf.

Furthermore, and more importantly, during the initial stages of the administrative appeal of this case, nothing in the Board's interim regulations required a party to present all procedural objections within some specified time before a scheduled hearing. Indeed, the procedural regulations that were finally adopted by the Board are relatively informal.[61] There are no strict time limits for motion practice or waiver rules for defenses not raised at the earliest possibility by responsive pleading. Nothing in the PAB regulations makes "untimely" or otherwise improper the filing of a motion to disqualify counsel just prior to a hearing. Hence, the conduct complained of here " 'falls far short' of conduct which would raise a serious question whether [the GAO] ... is estopped from" raising the issue of disqualification. *Schweiker v. Hansen,* 450 U.S. 785, 790, 101 S.Ct. 1468, 1472, 67 L.Ed.2d 685 (1981) (quoting *Montana v. Kennedy,* 366 U.S. 308, 314, 81 S.Ct. 1336, 1340, 6 L.Ed.2d 313 (1961)).

Fortunately, the PAB abandoned its attempt to pass over the GAO's disqualification motion and addressed the arguments therein on reconsideration. The motion having been properly presented and given full consideration by the PAB in the proceedings below, we see no bar to review of the disqualification issue here. The GAO's failure to show prejudice and ability to raise the issue by seeking direct review of 4 C.F.R. § 28.17(d) are immaterial.

101 S.Ct. 1468, 1470, 71, 67 L.Ed.2d 685 (1981) (per curiam). But there remains a substantial body of precedent suggesting that a much less stringent standard applies, *see id.* at 791, 101 S.Ct. at 1472 (Marshall, J., dissenting) (citing case law), and the majority in *Schweiker* appears to have acknowledged that the law is still unsettled, *id.* at 788, 101 S.Ct. at 1470. *See also INS v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973) (per curiam); *Montana v. Kennedy,* 366 U.S. 308, 314–15, 81 S.Ct. 1336, 1340–41, 6 L.Ed.2d 313 (1961). We express no view on what the proper standard is or should be since no misconduct occurred here, affirmative or otherwise.

**58.** *See infra* note 62.

**59.** The Board published proposed and interim regulations governing its procedures on March 10, 1981, *see* 46 Fed.Reg. 15,857 (1981), and, after taking comments, permanently adopted those regulations in slightly amended form on July 13, 1981, *see* 46 Fed.Reg. 35,475 (1981).

**60.** Brief for GAO 10 n. 5; Brief for PAB 5.

**61.** *See* 4 C.F.R. §§ 28.1–.113 (1982).

528

### 2. The Statutory Authority Permitting the General Counsel to Prosecute Appeals in Adverse Action Cases

Under 4 C.F.R. § 27.18(d), the General Counsel is required to prosecute an appeal in an adverse action case, if the General Counsel "determines that there is reasonable evidence to believe that the petitioner's rights under the Act have been violated" and the petitioner makes no "elect[ion] not to be represented by the General Counsel." [62] The GAO challenges the validity of this rule on the following grounds:

> To ensure that GAO employees would continue to have the same rights and benefits enjoyed by other federal employees, Congress established the Appeals Board to "perform the functions that the Office of Personnel Management, the Merit Systems Protection Board, the Federal Labor Relations Authority, and the Equal Employment Opportunity Commission would otherwise perform." Section 4(m)(1) of the Act, 31 U.S.C. 52–3(m)(1), required the Board to promulgate regulations providing procedures for the protection of employees' rights. On July 21, 1981 [sic], the Appeals Board promulgated these regulations....

> As authority for [section 28.17(d) ] ..., the Board stated that, since its own authority is analogous to that of EEOC, MSPB, and FLRA, its General Counsel, therefore, has the same authority as the General Counsel of the FLRA and the Special Counsel of the MSPB. *See* 46 Fed.Reg. 35475–6.... However, ... neither the General Counsel of the FLRA

nor the Special Counsel of the MSPB would have authority to act as Shaller's personal counsel. Accordingly, the Appeals Board's General Counsel also lacks such authority.

Brief for GAO 15.

■ We reject the GAO's restrictive interpretation of the GAOPA. "[G]uided not only by our usual policy of deferring to an agency's interpretation of its enabling act, but especially by the requirement that we pay heed to the 'contemporaneous construction of a [new] statute by [those] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new," *Frazier v. MSPB,* 672 F.2d 150, 162 (D.C.Cir.1982) (quoting *Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961), and *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933)), we defer instead to the PAB's construction and, accordingly, uphold the authority of the General Counsel to represent individual employees before the Board.[63]

a. *Plain Language of the Statute.* In support of its position in this case, the GAO would have us skip immediately to the legislative history of the GAOPA. Rather, "[w]e begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64

---

**62.** Under section 28.17(a) (1982), the General Counsel must conduct investigations on all petitions properly filed with the Board. Section 28.17(d) provides that:

> If, following the investigation, the General Counsel determines that there is not reasonable evidence to believe that the petitioner's rights under the Act have been violated, then the General Counsel shall not represent petitioner. If the General Counsel determines that there is reasonable evidence to believe that the petitioner's rights under the Act have been violated, then the General Counsel shall represent petitioner unless the petitioner elects not to be represented by the General

Counsel. Such petitioner may represent himself/herself or obtain other legal counsel. It is clear that petitions appealing adverse actions may properly be filed with the Board. *See* 31 U.S.C. § 52–3(h)(1) (Supp. V 1981) (amended 1982).

**63.** This case presents the unusual situation of two "agencies" charged with the execution of the GAOPA. But under our view of the statute, the PAB has discretion to interpret and implement provisions governing the role of the General Counsel. *See* Parts II.C.2.b. and II.C.2.c. *infra.* Thus, in this instance, the rule of deference applies to the PAB's interpretation of the GAOPA.

L.Ed.2d 766 (1980). Thus, we turn to section 4(g) of the GAOPA,[64] which provides that:

> The General Counsel shall—
>
> (A) investigate an allegation about a prohibited personnel practice under section [3(b)(1)(B) of this Act] . . . to decide if there are reasonable grounds to believe the practice has occurred, exists, or will be taken by an officer or an employee of the General Accounting Office;
>
> (B) investigate an allegation about a prohibited political activity under section [3(b)(1)(C) of this Act] . . . ;
>
> (C) investigate a matter under the jurisdiction of the Board if the Board or a member of the Board requests; and
>
> (D) help the Board carry out its duties and powers.

The GAO concedes that, at least in subsections (A) and (B) of this provision, the term "investigate" must be read to include both *investigatory* and *prosecutorial* functions. Although conceding that the General Counsel clearly has the authority to *prosecute* cases before the Board, the GAO nonetheless argues that this prosecutorial role does not extend to cases brought pursuant to individual employee appeals of adverse actions. This argument is made despite the fact that subsection (C) of section 4(g)—upon which the Board relies—also employs the term "investigate" to describe the functions of the General Counsel. In other words, at no place in section 4(g) has Congress used the word "prosecute" either to include or exclude duties from within the range of responsibilities assigned to the General Counsel; and in subsection (D) of section 4(g), the statute broadly requires the General Counsel to "help the Board

carry out its duties and powers" (without reference to either "prosecute" or "investigate"). Yet, the GAO makes the fathomless argument that the General Counsel may prosecute in all cases *except* those involving individual employee appeals of adverse actions.

We prefer a more consistent reading of the statute. Although we agree that the term "investigate" contemplates a prosecutorial role for the General Counsel in proceedings before the PAB, we reject the GAO's attempt to read the term more narrowly in subsection (C) than in subsections (A) and (B). Quite literally, the General Counsel may "investigate and prosecute" any matter within the Board's jurisdiction if required to do so by the Board or any member of the Board. And under 4 C.F.R. § 28.17(d), the PAB has directed the General Counsel to do just that: he must investigate all petitions received, and he must pursue any petition found to be meritorious on behalf of the petitioner (unless, of course, the petitioner declines representation). Nothing in this regulation distinguishes between different types of cases, and nothing in the GAOPA requires such a distinction.

Moreover, the open-ended language of sections 4(g) (4) [65] and 4(m) [66] supports the conclusion that, within the bounds of law and reason, the GAOPA authorizes whatever sort of advocacy role for the General Counsel the Board determines to be appropriate. Section 4(g)(4) provides that the General Counsel shall "help the Board carry out its duties and powers," and section 4(m) grants the Board power to promulgate regulations "providing for officer and employee appeals consistent with sections 7701 and 7702 of title 5 . . . ." [67] These provisions

---

**64.** Pub.L. No. 97–258, § 752(b)(3), 96 Stat. 901 (codified with some differences at 31 U.S.C. § 52–3(g) (Supp. V 1981)).

**65.** 31 U.S.C. § 52–3(g)(4) (Supp. V 1981) (amended 1982).

**66.** 31 U.S.C. § 52–3(m) (Supp. V 1981) (amended 1982).

**67.** The right to representation by the General Counsel is "consistent with sections 7701 and 7702 of title 5 . . . ."

Section 7701 establishes generally applicable procedures in appeals to the MSPB, and section 7702 establishes specially applicable procedures in "mixed cases" involving allegations of discrimination as well as allegations otherwise cognizable in appeals cases. Except for certain decisional time limits, procedures for coordination with the EEOC, and provisions relating to

give the Board broad discretion to design appropriate procedures for appeals cases and to include in that design whatever role for the General Counsel it deems helpful in discharging its duties and powers. Consistent with the discretion thereby granted, the PAB has concluded that the role created for the General Counsel under 4 C.F.R. § 28.-17(d) "helps" the Board carry out its duties and powers by facilitating an efficient adjudicative procedure for *all* petitions filed with the Board, including adverse action appeals petitions. We think that conclusion is both consistent with the statute and entirely rational [68] and, therefore, we decline to disturb it.

b. *Legislative History of the Statute.* The GAO insists that, despite the plain language of the GAOPA, the statute's legislative history shows a clear congressional intent to limit the General Counsel's role in appeals cases. Of course, " '[w]hen aid to the construction of the meaning of words, as used in a statute, is available, there certainly can be no 'rule of law' that forbids its use, however clear the words on 'superficial examination.' " *United States v. Security Industrial Bank,* —— U.S. ——, —— n. 12, 103 S.Ct. 407, 414 n. 12, 74 L.Ed.2d 235 (1982) (quoting *United States*

*v. American Trucking Association,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940)). Lest we ignore a "clearly expressed legislative intention ... contrary" to the plain language of the statute, *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. at 108, 100 S.Ct. at 2056, we turn to the legislative history.

What strikes us immediately about the legislative history of the GAOPA is that it contains nothing whatsoever to indicate that Congress intended to exclude the General Counsel from appearing before the Board in some particular category of cases. In enacting the GAOPA, Congress never addressed the precise role of the General Counsel and, instead, as we read the legislative history, chose to leave the formulation of the General Counsel's role to the discretion of the PAB.

There is some language in the *House Report* which, alone, suggests that the General Counsel would "act[ ] in the place of the Special Counsel to the Merit Systems Protection Board." *House Report* 6. But this language must be read in light of the congressional purpose to assure GAO employees the same degree of protection afforded executive employees. Read in that

judicial review, "mixed cases" are decided in accordance with "appellate procedures applicable under section 7701," 5 U.S.C. § 7702(a)(1) (Supp. V 1981). Thus, we look to section 7701 to determine the procedural rules with which employee appeals procedures before the PAB must accord.

Under section 7701(a)(2), an appellant before the MSPB has the right "to be represented by an attorney or other representative." Since this provision does not bar an attorney provided by the MSPB—indeed, does not even require that the representative *be* an attorney—representation before the PAB by the General Counsel falls easily within its scope. That the MSPB's *regulations* do not grant a comparable procedural privilege is immaterial; the GAOPA merely requires consistency with *statutory* rights provided under title 5.

**68.** Representation by the General Counsel in appeals cases may, for example, provide (1) a valuable screening function, since petitioners found not to qualify for assistance by the General Counsel might be less likely to pursue their petitions further; (2) better advocacy than that of *pro se* petitioners or private attorneys, par-

ticularly in light of the General Counsel's intimate familiarity with the PAB's procedural rules and decisionmaking needs; and (3) a cost-efficient way of minimizing both attorney's fee awards against the GAO and the time required of the Board to adjudicate attorney's fee matters.

At oral argument, counsel for the GAO suggested that, rather than save attorney's fee costs, 4 C.F.R. § 28.17(d), by providing government-sponsored legal counsel, violates the rule that attorney's fee awards are available against the government only where there is clearly expressed statutory authorization. This argument is clever, but unavailing. Even if 4 C.F.R. § 28.17(d) arguably saves petitioners (who do not decline to be represented by the General Counsel) the cost of hiring counsel, that effect, obviously, does not draw funds from the fisc beyond those expended in the normal course on the General Counsel's salary. Furthermore, this so-called "saving" is no different from that gained by an employee whose case is prosecuted by the General Counsel at the FLRA or NLRB.

context, the language of the committee report does not suggest that the General Counsel was to be *limited* to a role comparable to that of the Special Counsel of the MSPB. Indeed, by recognizing that the FLRA's General Counsel also provides a model for the General Counsel, even the GAO concedes that the General Counsel's role is not restricted solely by reference to the duties of the Special Counsel. Brief for GAO 15. We think it plain beyond dispute that Congress did not intend that the General Counsel would function *only* as the enforcer of merit system principles. Although neither congressional committee report specifically outlines the details of the General Counsel's job, the expansive language of section 4(g)(4) makes it clear that Congress expected the General Counsel's role to be far more various than that of the Special Counsel.

Implicit in the GAO's argument is an extraordinary suggestion that the PAB must follow *precisely* the procedural models employed by executive branch boards and agencies. We find this suggestion to be absurd, both because it is not required by the GAOPA, and because it would be virtually impossible (and surely impractical) to require the PAB to adopt all of the sometimes inconsistent procedures of several different boards. If Congress had intended the institutional structure of the PAB to mirror precisely the structures of the boards and agencies handling personnel cases in the executive branch, then the GAOPA could have been written simply to adopt the laws governing the MSPB, FLRA, Special Counsel and EEOC.[69] Plainly, this was not the route selected by Congress. Instead, the GAOPA created the PAB as a hybrid board, with the combined functions of several boards and with a statutory procedural design that is purposely sparse in detail.

The congressional committee reports demonstrate a legislative view that combining the functions of the various executive personnel agencies would sufficiently guarantee employees of the GAO the rights and remedies enjoyed by employees in the executive branch. With these substantive protections guaranteed, Congress left to the PAB the discretionary task of formulating appropriate procedures and a proper role for the General Counsel. We see nothing to warrant questioning how the PAB has undertaken this task.

c. *The Authority of the PAB Versus that of the Comptroller General.* Undoubtedly recognizing that the GAO's personnel system need not, and cannot in all respects, precisely mirror the executive personnel system, the GAO argues in the alternative that "if there is to be in GAO's personnel system a departure from the executive branch's personnel system, Congress made it absolutely clear that the Comptroller General was to make that decision." Reply Brief for GAO 3. We disagree. Both the Senate and House Committee reports indicate that the "Comptroller General" was to have "wide discretion" to establish an independent personnel system for the GAO.[70] But this discretion dates from the earliest legislative proposals to create an independent personnel system for the GAO, and these proposals ultimately evolved into a "carefully drawn bill," which—by establishing the PAB as a discrete, independent entity within the system—struck "a proper balance between the need for GAO to have its own flexible personnel management system and the need to preserve the essential employment rights of GAO staff members," *Senate Report* 3. Under the concentric structure thus adopted, the Comptroller General and the PAB each necessarily pos-

69. The Board, in fact, considered designing its procedural regulations strictly on the institutional model of the executive branch, but decided not to do so. In explaining the structure chosen, the Board's notice of final rulemaking pointed out that "[o]ne of the first policy decisions faced by the members of the [PAB] ... was whether to adopt four separate procedures

paralleling those of the executive branch or whether to combine some or all of the jurisdictional subjects into one procedure. The Board elected to create, to the maximum extent possible, one procedure." 46 Fed.Reg. 35,476 (1981).

70. *See supra* text at p. 523.

sesses "wide discretion" granted by the GAOPA to contribute to the establishment of an independent personnel system. The Comptroller General has power to issue regulations governing matters within his sphere of jurisdiction, and the PAB has like authority. To grant the GAO, in effect, veto power over any PAB regulation "providing for employee appeals" or directing the General Counsel to "help the Board carry out its powers and duties," would be patently inconsistent with the division of functions between the PAB and the GAO. Hence, the discretion granted by the GAO-PA to set up an independent personnel system was properly exercised by the PAB in this instance.

d. *"Comparable" Models.* Even if the GAO's "strict incorporation" theory were correct, the general counsel models established by the Reform Act—the MSPB's Special Counsel and the FLRA's General Counsel—would nevertheless permit the enforcement of employee rights through government counsel prosecution in adverse action cases. This court recently held in *Frazier v. MSPB,* 672 F.2d 150, 162 (D.C.Cir.1982), that in corrective action cases the Special Council is akin to "an ombudsman responsible for investigating and prosecuting violations of the [Reform] Act," *id.,* and is not an "employees' advocate," *id.* The *Frazier* court was not required to address directly the role of the Special Counsel in appeals cases; yet, the court recognized that, because "the Special Counsel [has] the right to 'intervene or otherwise participate in any proceeding before the [MSPB] . . . ,' " *id.* at 163 n. 45 (quoting 5 U.S.C. § 1206(i) (Supp. V 1981)), "[a]n individual improperly discharged for whistleblowing . . . could presumably seek the assistance of the Special Counsel in a Chapter 77 appeal . . . ," *id.* at 163. The court thus made clear that the Special Counsel would always be "fundamentally concerned with the integrity of the merit system," *id.;* this view, however, obviously and necessarily envisions investigatory and prosecutorial roles for the Special Counsel to vindicate certain employee rights under the applicable statute.

Similar observations may be made concerning the role of the General Counsel at the FLRA, whose functions are based on those of the General Counsel of the National Labor Relations Board ("NLRB"). The FLRA General Counsel has authority to prosecute complaints coextensive with the FLRA's jurisdiction under Title VII of the Reform Act, an authorizing statute that sweeps as broadly as the GAOPA. Thus, he may "file and prosecute complaints under [Title VII of the Reform Act]," 5 U.S.C. § 7104(f)(2)(B) (Supp. V 1981), and he may "exercise such other powers of the Authority as the Authority may prescribe," 5 U.S.C. § 7104(f)(2)(C) (Supp. V 1981). It is immaterial that "the General Counsel of the FLRA would not have had jurisdiction over a complaint like Shaller's . . . ," Brief for GAO 22, because the FLRA itself would not have had jurisdiction to adjudicate a complaint like Shaller's. And it surely proves too much to say that the General Counsels of the FLRA and the NLRB prosecute unfair labor practice complaints "in the public interest" rather than on behalf of individual charging parties, as counsel for the GAO suggested at oral argument. "To employ the rhetoric of 'public interest' . . . is not to imply that the public right excludes recognition of parochial private interests." *UAW Local 283 v. Scofield,* 382 U.S. 205, 218, 86 S.Ct. 373, 381, 15 L.Ed.2d 272 (1965). Underlying the public interest in enforcement of unfair labor practice cases is a private interest held by individual employees to be secure in the statutory protection against unfair labor practices.[71]

To the extent that the GAOPA requires that the office of the General Counsel at

---

71. *See Concrete Materials of Georgia, Inc. v. NLRB,* 440 F.2d 61, 67 (5th Cir.1971) ("[NLRB's] General Counsel represents the public interest in preventing the interference to interstate commerce caused by unfair labor practices, and, at the same time, the private interest of the charging party to be free from the harm to his interests caused by unfair labor practices"); *cf. Frazier v. MSPB,* 672 F.2d 150, 163 (D.C.Cir.1982) ("There will, of course, be many instances in which the interests of the Special Counsel and of a particular employee converge.").

the PAB be patterned after like offices at the MSPB and FLRA, we believe that the Board's regulations admirably achieve whatever comparability is necessary within the bounds of practicality. The cited general counsel models have certain characteristics: all provide for participation in the adjudicatory process before a board, prosecutorial authority to enforce laws and regulations coextensive with the board's jurisdiction, and substantial policy-making responsibility (screening cases and selecting matters that should properly be considered by the board). The PAB model plainly fits within this general design. To be sure, the General Counsel at the PAB performs his functions with respect to a wider range of *substantive* issues than do any of the other individual general counsels at the executive branch boards. But this is because of the broad jurisdictional compass of the PAB (as compared with any of the other individual boards), plus the wide discretion granted to the PAB to define the role of the General Counsel.[72]

e. *Summary.* Under the GAOPA and existing Board regulations, the General Counsel acts to investigate and prosecute claims that appear to be meritorious, cognizable under applicable law and within the jurisdiction of the PAB. These responsibilities resemble—with striking similarity— the responsibilities of the General Counsels at the FLRA and the NLRB, where prosecutorial claims also may be based upon claims of wrongdoing raised by individual employees. It never has been thought that the General Counsel at the FLRA was not acting in the public interest when he was required to prosecute certain cases on behalf of individual claimants. No such contention is applicable with respect to the PAB's General Counsel either, especially since all cases at the PAB are prosecuted by the General Counsel only upon a determination that they appear meritorious.

Mindful of its role as "the unique and singular body created by Congress as the ultimate administrative forum for [the protection of] ... the rights [of GAO employees]," [73] the PAB has determined that it will be well served by a General Counsel who may appear in *all* cases properly before the Board. We defer to that judgment. Specifically, we hold that the language and legislative history of the GAOPA permit

---

**72.** One final point made by the GAO deserves brief mention. The GAO asserts that 4 C.F.R. § 28.17(d) "creates a blatant conflict of interest between the General Counsel's role as employee and advisor to the Board and his role as representative of employees in adversarial proceedings before the Board." Brief for GAO 13. "Congress intended no such conflict," the GAO argues. *Id.* The GAO attempts to limit its conflict of interest objection to the General Counsel's representation of individual employees in appeals cases, but the same objection could be made in any case in which the General Counsel appears before the Board.

This argument sweeps far too broadly. Congress clearly contemplated *some* advocacy role for the General Counsel, as the GAO recognizes in conceding that the General Counsel must "investigate *and* prosecute" certain cases within the Board's jurisdiction. At the same time, Congress explicitly chose to give the Board significant control over the General Counsel. *See* 31 U.S.C. § 52-3(f) (Supp. V 1981) (amended 1982) (giving the Chairman of the PAB power over the General Counsel's selection and rate of pay, and providing that the General Counsel serves at the Chairman's pleasure); 31 U.S.C. § 52-3(g)(3)–(4) (Supp. V 1981) (amended 1982) (requiring the General Counsel to in-

vestigate all matters within the Board's jurisdiction on request of the Board or any member thereof, and to help the board carry out its duties and powers). Whatever conflict of interest this structure creates has been built in by Congress.

Although arguably the General Counsel's relationship to the Board might adversely affect a petitioner who chooses to proceed *pro se* or with private counsel (by creating an inference that the petition is meritless), that problem presents a different case than the one we face today. We note, however, that the Board's rules allow a petitioner freely to decline the General Counsel's representation and, in cases where the General Counsel does not appear, the possibility that the petitioner has exercised this choice should be sufficient to dispel any inference by the Board as to the merits of the case. Moreover, although it is not entirely clear whether the Board will have access to investigative reports by the General Counsel where he does not appear, such reports are not subject to discovery and may not be introduced as evidence before the Board. 4 C.F.R. § 28.-17(c) (1982).

**73.** *Decision on Reconsideration,* J.A. 103.

the General Counsel to appear as a prosecutor in all cases within the Board's jurisdiction. The Board thus correctly denied the GAO's motion to disqualify the General Counsel from representing Shaller in the proceedings below.

### D. *Issues Pertaining to Jurisdictional Questions and the Merits*

Under 4 C.F.R. § 7.6(e)(1) (1982), adverse action appeals to the PAB and related procedural safeguards are not available to "[e]mployees who are serving a trial period under an initial appointment or who has [sic] not completed one year of current, continuous employment under other than a temporary appointment limited to one year or less." The parties appear to agree that, under this provision, the Board would have no jurisdiction over this case if Shaller was probationary at the time of his discharge.[74] The parties also seem to agree that whether Shaller was probationary, in turn, depends on civil service regulations governing when a probationary period must be served,[75] and provisions of the Federal Personnel Manual ("FPM") elaborating on the applicable civil service regulations.[76]

The general principle established by these rules and regulations is that an employee given a career-conditional appointment from a certificate of eligibles must serve a new probationary period regardless of whether he is currently serving, or has already completed, a trial period.[77] But an employee appointed non-competitively by transfer need not serve a new probationary period if he has completed a prior trial period; such an employee need only complete the trial period that he was serving when transferred.[78] As framed by the parties, the issue thus focuses on whether Shaller was appointed competitively from a certificate of eligibles or non-competitively by transfer. The matter is complicated by the fact that Shaller's SF 52 indicated *both* transfer and selection from a certificate of eligibles.[79] Although the SF 52 does indicate that Shaller was subject to completion of a new trial period,[80] the GAO does not seriously argue that this notation controls whether Shaller in fact had to serve a new trial period. Both parties attempt to resolve the ambiguity by focusing on the nature of Shaller's appointment.

The GAO, relying on *Oulvey v. Veterans Administration,* MSPB Dock. No.

---

**74.** Brief for GAO 23–24; Brief for PAB 9. In addition to 4 C.F.R. § 7.6(e)(1), both parties cite GAO Order 2315.1, ch. 7, ¶ 4a.(5) (1980), part of the GAO's Operations Manual, as a secondary source.

**75.** 5 C.F.R. §§ 315.801(a)(1), 315.801(b) (1982).

**76.** FPM ch. 315, subch. 8, ¶¶ 8–2.a, 8–2.e; subch. 5, ¶ 5–1 (1981).

**77.** FPM ch. 315, subch. 8, ¶ 8–2.a. provides, in part, that:

An eligible given a career-conditional or career appointment by selection from a certificate of eligibles is required to serve a probationary period of one year. This applies not only to the first appointment of this kind, but to any subsequent career or career-conditional appointment by selection from a certificate of eligibles regardless of whether the appointee had previously completed a probationary period.

See 5 C.F.R. § 315.801(a)(1).

**78.** FPM ch. 315, subch. 8, ¶ 8–2.a., provides, parenthetically, that:

(If an agency selects an employee from a certificate of eligibles, but appoints him/her noncompetitively by reinstatement, transfer, or position change, the agency follows the instructions on probation in paragraph b or e below, as appropriate.)

Paragraph 8–2.e., referenced in this parenthetical clause, provides that:

The promotion, demotion, reassignment, or transfer of a career or career-conditional employee before he/she has completed probation is subject to satisfactory completion of the probationary period in the new position. The employee does not have to serve a *new* probationary period after position change or transfer, regardless of a change in his/her line of work.

(emphasis in original). *See* 5 C.F.R. § 315.-801(b). *But see* GAO Order 2315.1, ch. 7, ¶ 2b. ("Personnel transferring non-competitively to GAO from other Federal agencies will normally be required to serve a 1 year trial period, regardless of whether they previously completed a trial period.").

**79.** *See supra* text accompanying notes 6–10.

**80.** *Id.*

SL07528010038, slip op. (July 29, 1981), argues that, "where an employee is selected from a certificate of eligibles and given a career-conditional appointment which is effectuated by means of a transfer, . . . that employee is appointed competitively." Brief for GAO 27. The GAO thus urges that, since Congress intended the GAO to adopt MSPB decisional law, or at least to depart from MSPB precedent only for compelling reasons, the PAB erred in concluding that Shaller was appointed non-competitively. The PAB, on the other hand, contends that a transfer is defined by the FPM as the "'non-competitive employment of a career or career-conditional employee when he moves from one agency to another (with or without promotion) without a break in service of one full workday,'" Brief for PAB 12 (quoting FPM ch. 315, subch. 5, ¶ 5.1); thus, according to the PAB, since Shaller's appointment was designated as a "transfer," Shaller was by definition transferred non-competitively. Following the analysis used in its decision on reconsideration, the PAB points out that Shaller was transferred *after* he was selected from a certificate of eligibles. The *Oulvey* case, argues the PAB, is inadequately reasoned and ignores the FPM's definition of a transfer as non-competitive.

Largely because the GAO relies so heavily on the *Oulvey* case—which, even if it reaches the right result, is indeed conclusorily reasoned—the parties' analysis sheds little light on the nature of Shaller's appointment. The GAO asserts that *Oulvey* requires the conclusion that Shaller was selected from a certificate; the PAB, without truly joining issue, responds that Shaller was transferred. Neither party supplies a complete rationale for its position or fully responds to the other. As a result, we are left in an inscrutable labyrinth of civil service rules with precious little to guide proper disposition.

█ We shall defer decision on these issues pending further consideration by the PAB. First, the Board must, on remand, expressly consider the MSPB's *Oulvey* deci-

sion. Although the GAO overstates the alleged binding effect of MSPB precedent on the PAB, Congress did at least "expect[ ] . . . the Board [to] . . . refer to decisions of [executive] . . . agencies for guidance." *House Report* 6. To say that this constitutes a congressional "command to the Appeals Board to adopt the decisions of the MSPB," Reply Brief for GAO 7, is inconsistent with the independent charter established for the PAB under the GAOPA. We do think, however, that Congress encouraged the PAB, at a minimum, to consider MSPB decisions and other executive agency precedent before deciding questions already settled in the executive personnel system. The PAB appears to have ignored that suggestion here, since it failed to give any express consideration to the *Oulvey* case, even though *Oulvey* was decided before both of the PAB's decisions. Indeed, there is some evidence that the PAB may have given weight to the initial decision in *Oulvey* that was subsequently overturned by the full MSPB.

Second, the Board must consider several additional questions that may aid our disposition of this issue. For example, there is the question whether Shaller was even eligible for non-competitive appointment, since, under 5 C.F.R. § 1.3(c) (1982), it appears that an employee does not acquire "competitive status" until he has completed a probationary period. There is also the question whether Shaller had to serve a new probationary period even if he was appointed non-competitively by transfer, since the GAO's Operations Manual appears to require a trial period for such appointees.[81] And, if Shaller had to serve a new probationary period upon his appointment to the GAO, there is still the question whether 4 C.F.R. § 7.6(e)(1) applies here, since its literal language would not seem to cover this case.

Without full consideration of these questions by the PAB, we decline to decide them. Particularly since the GAOPA is a new statute that both parties have a duty

---

81. *See* GAO Order 2315.1, ch. 7, ¶ 2b.

**536**

to implement, we think the PAB, aided by briefing from the GAO and the General Counsel, should be the first to address the issues herein raised. Accordingly, we remand the record for consideration (or reconsideration) of the following issues, as well as any other issues deemed relevant by the Board:

1. In *Oulvey,* the MSPB decided that an employee whose notice of personnel action showed both transfer and selection from a certificate of eligibles had been appointed competitively. Does the PAB adhere to its result in light of this decision? If so, is *Oulvey* distinguishable from the instant case?

2. Did Shaller have "competitive status" within the meaning of 5 C.F.R. § 1.3(c)? If not, how could he have been transferred non-competitively? What is the effect of the purported non-competitive transfer of an employee who is ineligible for non-competitive appointment?

3. What is the effect on this case of GAO Order 2315.1, ch. 7, ¶ 2b., which, in apparent contradiction to civil service rules, generally requires non-competitive transferees to serve a new probationary period?

4. Even if applicable rules and regulations require Shaller to serve a new trial period upon his appointment to the GAO, does 4 C.F.R. § 7.6(e)(1) make an adverse action appeal unavailable here even though the literal language of that provision does not appear to apply? Consider, in this regard, the MSPB's decision in *Rochniak v. Department of the Navy,* MSPB Dock. No. BN315H8090014, slip op. (Mar. 24, 1982).

### III. CONCLUSION

For the foregoing reasons, we hold that the GAO may seek review of decisions by the PAB, that the GAO is not estopped from challenging the General Counsel's authorization to appear in these proceedings, and that the General Counsel may appear before the Board in any case within the Board's jurisdiction. We defer decision on merits (including questions pertaining to the Board's jurisdiction) pending further consideration by the Board of the matters set forth in Part II.D. *supra.*

Accordingly, the decision of the PAB is affirmed in part and the record is hereby remanded for further proceedings. Following reconsideration by the Board, which shall occur not later than ninety (90) days from the date of this decision, the matter shall be reviewed by this panel for final disposition.

*So Ordered.*